413 S.E.2d 692

**Betty Jo SUMMERS, n/k/a Betty Jo Kidd, Plaintiff Below, Appellee,**

v.

**Samuel David SUMMERS, Jr., Defendant Below, Appellant.**

**Betty Jo SUMMERS, n/k/a Betty Jo Kidd, Plaintiff Below, Appellant,**

v.

**Samuel David SUMMERS, Jr., Defendant Below, Appellee.**

**Nos. 19956, 19896.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 11, 1991.

Decided Dec. 18, 1991.

Rehearing Denied Feb. 13, 1992.

R. William Kasserman, Seibert, Kasserman, Farnsworth, Gillenwater, Glauser & Richardson, Wheeling, for Betty Jo Summers.

William J. Leon, Vorbach & Gianola, Morgantown, for Samuel David Summers.

WORKMAN, Justice:

Issues raised in this consolidated appeal include the enforceability of an unsigned post-decree property settlement agreement and the existence of jurisdiction to modify a divorce decree in view of this Court's decision in *Segal v. Beard*, 181 W.Va. 92, 380 S.E.2d 444 (1989), wherein we ruled that family law masters and circuit judges are without jurisdiction to hear modifica-

tion petitions which lack issues of spousal or child support, custody, or visitation. For the reasons set forth below, we conclude that a *Segal v. Beard* jurisdiction problem was not present here and that the Taylor County Circuit Court should have inquired into the post-decree settlement agreement to ensure that both parties voluntarily entered into the agreement and that the agreement was not obtained by fraud or duress. Accordingly, we reverse and remand the lower court's decision.

The parties were married in 1967 and four children resulted from that marriage. Mrs. Summers initiated the underlying divorce proceedings, seeking a divorce on grounds of irreconcilable differences. By order dated August 26, 1987, the family law master issued his recommended findings of fact, which included, *inter alia*, that Mr. Summers should get custody of the minor children[1] of the parties whose ages at that time were seventeen, fourteen, and thirteen. The family law master further recommended the sale of substantially all of the marital assets, the proceeds of which were to be applied to any outstanding indebtedness, and then to the parties in equal portions. Additionally, Mrs. Summers would receive the sum of $200 per month as alimony for a period of five years or until remarriage. By order dated November 13, 1987, the circuit court adopted verbatim the recommendations of the family law master and granted a divorce on the requested grounds.

Pursuant to a motion filed on February 10, 1988, by Mrs. Summers to clarify certain aspects of the November 1987 final decree of divorce, the parties appeared on that same date before the family law master for a further hearing on this matter. Following that hearing, the family law master issued additional findings of fact and recommendations by order dated March 2, 1988, which, in addition to ordering the payment of a $600 alimony arrearage, suggested that the parties select an auctioneer to sell the remaining marital assets within 120 days. By order dated March 14, 1988, the circuit court directed the parties to act in accordance with the family law master's recommendations as set forth in the March 2, 1988, order.

The next procedural event which occurred was the filing of a petition by Mrs. Summers seeking a rule to show cause on May 27, 1988. The petition was prompted by Mr. Summers' failure to comply with prior court orders concerning payment of alimony and signing auction contracts, as well as permitting the marital home[2] to be foreclosed upon. Subsequent to the court's issuance of a rule to show cause, the circuit court entered an order dated July 29, 1988, directing that funds from the sale of the marital home be held in escrow and that all remaining property be sold pursuant to prior court orders.

On March 6, 1989, Mr. Summers filed a petition seeking to enforce an alleged oral post-decree settlement agreement dated July 18, 1988. Pursuant to this agreement, Mrs. Summers allegedly agreed to accept the sum of $30,000 in exchange for her rights in all marital real property which had not been previously distributed. Mrs. Summers responded to this petition on March 28, 1989, claiming that the attorney who represented her at the time of the alleged agreement had no authority to settle the matter on her behalf; that she was under duress when she consented to the $30,000 figure contained in that agreement; and further, that she was fraudulently induced by her former attorney to accept the $30,000 figure.

The settlement agreement at issue was never reduced to writing and executed by the parties. The only "writing" in this case is an unsigned letter from Mrs. Summers' former attorney to Mr. Summers dated July 18, 1988, which purports to set forth the alleged terms of the agreement. Since a copy of the letter "agreement" was not included in the record designated for

---

1. The family law master's decision indicates that the infant children "have, essentially, elected to stay with their father."

2. The final order of divorce does not specify in any way which party was required to make mortgage payments. It appears that the home was to be sold at a public sale.

appeal,[3] we are limited to the family law master's findings set forth in his Recommended Decision of July 25, 1989, to identify the provisions of the alleged agreement. According to the Recommended Decision, the "agreement" resulted from the following chain of events:

V. The evidence adduced herein indicated that immediately after adjournment of the hearing held on 12 July 1988, Mr. Straface [Mrs. Summers' former counsel] approached defendant [Mr. Summers] and advised defendant of his belief that if the property was sold at the trustee's sale, there would be no net proceeds available for distribution to the parties. Mr. Straface therefore requested that defendant make an offer to settle the dispute between the parties concerning the division of their marital assets and thereby avoid the scheduled foreclosure sale. In response to this request, defendant stated that he would be willing to pay $30,000.00 to the plaintiff [Mrs. Summers] in exchange for her interest in all the marital property and that he would assume responsibility for all marital debts. On or about 14 July, Mr. Straface contacted defendant and requested that in addition to his offer to pay $30,000.00, defendant also pay one half the proceeds from the sale of a certain high lift tractor, one half of the net proceeds from the sale of a motor home and that defendant pay attorneys fees previously ordered by the Court and certain court costs. Defendant testified that he agreed to these terms.

VI. ... By letter dated 18 July 1988 which was admitted into evidence as Defendant's Exhibit 1, Mr. Straface wrote to Mr. Summers setting forth the proposed agreement.

With regard to this petition and counter-petition, the family law master prepared a recommended decision dated July 25, 1989, wherein he found that Mrs. Summers' former attorney had apparent authority to negotiate on her behalf; the family law master and the circuit court lacked jurisdiction to modify prior decrees concerning the sale of marital property in view of *Segal v. Beard;* and, in effect, that the court could not reverse the property transactions that had already been effectuated. Finally, on February 8, 1990, the circuit court entered an "Order on Petition for Enforcement of Distribution" adopting the family law master's recommendation as set forth in the July 25, 1989, order, finding that the issue of real property distribution had been settled and compromised such that Mr. Summers had title to all unsold real property and that distribution of any remaining property would be carried out in accordance with prior court orders. It is from this order that both parties appeal.

■ We address initially the enforceability of the unsigned post-decree property settlement agreement. Settlement agreements which are executed following a court order are enforceable even if the underlying proceeding is a divorce proceeding. *See D. H. Pritchard, Contractor, Inc. v. Nelson,* 147 F.2d 939 (4th Cir.1945); *see also* 1A Michie's Jurisprudence, *Accord & Satisfaction* § 2 (1980) (noting that judgments and obligations under seal may be settled); *Somerville v. Somerville,* 179 W.Va. 386, 369 S.E.2d 459 (1988) (post final-decree settlement incorporated in further court order which established unequal marital property division void based on court's failure to make specific reference to W.Va.Code § 48-2-32(c) factors).

This Court recently made clear its preference for written property settlement agreements in *Gangopadhyay v. Gangopadhyay,* 184 W.Va. 695, 403 S.E.2d 712 (1991). In that case, which involved the oral recordation of a property settlement agreement at a final divorce hearing, this Court explained that certain "cogent policy reasons ... cause us to encourage the use of written separation agreements,[4] signed by the parties[:]"

---

3. The Recommended Decision of the family law master dated July 25, 1989, states that the July 18, 1988 letter "was admitted into evidence as Defendant's (Mr. Summers') Exhibit 1."

4. As defined by W.Va.Code § 48-2-1(h) (1986), the term "separation agreement" includes "a written agreement entered into by a husband and wife whereby they agree ... to ... settle

Obviously, such a procedure [oral placement of settlement terms on record] is fraught with the potential for misunderstanding and abuse. If the agreement is the product of eleventh hour negotiations or is agreed to on the eve of hearing, it may not bear the deliberateness and informed consent of a prior written agreement. The first time the court will hear the agreement is when it is dictated into the record.... [and] both the court and the parties may have difficulty remembering and understanding its terms. Finally, *the potential for fraud, duress, or coercion is much greater where the agreement is not reduced to writing before being presented to the court.*

*Id.* 184 W.Va. at 698–99, 403 S.E.2d at 715–16 (footnote omitted and emphasis supplied). We further noted that "a prudent attorney would make certain that a separation agreement was in writing and signed by the parties to indicate their approval of its terms." 184 W.Va. at 698, 403 S.E.2d at 715. As we previously concluded, there is no question that "requiring the parties to sign a written agreement ... militate[s] against a later claim that the agreement was coerced or inequitable." *Id.*

■ Notwithstanding the salutary policy reasons behind requiring written settlement agreements, we held as follows in *Gangopadhyay:*

1. Even though there is an express legislative preference in divorce cases for a separation agreement to be in writing and signed by the parties, we do not prohibit *per se* the practice of orally placing on the record the terms of a separation agreement if certain conditions are met.

2. Where an oral separation agreement is dictated on the record, additional inquiries must be made by the court or the family law master to ascertain that the parties understand its terms and have voluntarily agreed to them without any coercion. Furthermore, the court or the family law master must find that the terms of the agreement are fair and eq-

and compromise issues arising out of their mar-

uitable. This latter inquiry requires a disclosure of the financial background of the parties sufficient to justify the conclusion of the court or the family law master.

184 W.Va. at 695, 403 S.E.2d at 712, Syl. Pts. 1 & 2.

■ Given the factual contrast between the *Gangopadhyay* case where the settlement agreement was spread upon the record at the final hearing and the instant case where the alleged oral agreement was neither placed on the record nor presented for approval by the court, this case presents a much weaker argument for enforcement than was present in *Gangopadhyay.* In resolving whether the subject agreement is enforceable, we look to W.Va. Code § 48–2–16(a), the reasoning applied in *Gangopadhyay,* and the law of other jurisdictions.

West Virginia Code § 48–2–16(a) begins "[i]n cases where the parties to an action commenced under the provisions of this article have executed a separation agreement, *if the court finds that the agreement is fair and reasonable, and not obtained by fraud, duress or other unconscionable conduct by one of the parties....*" W.Va.Code 48–2–16(a) (emphasis supplied). As W.Va.Code § 48–2–16(a) makes clear, settlement agreements which are executed prior to the issuance of a final decree of divorce must be presented to the court for approval. *See id.; In re Estate of Hereford,* 162 W.Va. 477, 487, 250 S.E.2d 45, 51 (1978) (holding that "parties may do anything which they wish by their property settlement agreement as long as it is approved by the circuit court").

The agreement at issue in this case can be viewed at best as an oral agreement given the unsigned nature of the only document which even purports to represent the terms of the alleged compromise. As we reasoned in *Gangopadhyay,* the need for court approval and inquiry is greater "where the agreement is oral instead of written and where there are allegations of fraud, duress, or coercion." 184 W.Va. at

ital rights and obligations...."

699, 403 S.E.2d at 716 (footnote omitted). Notwithstanding the factual differences between this case and *Gangopadhyay,* the policy reasons which we articulated in *Gangopadhyay* for requiring both court inquiry and approval of oral settlement agreements in domestic cases are equally applicable to the case at bar. Given the oral nature of the post-decree settlement agreement under inquiry here, we conclude that the court must make those same inquiries required by W.Va.Code § 48-2-16(a) to determine whether such an "agreement is fair and reasonable, and not obtained by fraud, duress, or other unconscionable conduct" before the agreement can be enforced.

While we feel that no lengthy explanation is necessary to expound further upon the need for court approval of settlement agreements, be they pre- or post-decree, we offer several observations to elucidate our decision. Underlying the requirement of court approval set forth in W.Va.Code § 48-2-16(a) is an obvious recognition of the important interests that are at stake in a typical settlement agreement and the concomitant need to ensure that one party does not take advantage of the other when these interests are being compromised. While the interests at stake in the instant case pertained solely to disposition of certain real property and the changing of a beneficiary on an insurance policy, subjects such as child support, visitation, and alimony may properly be included in a property settlement agreement. *See* W.Va.Code § 48-2-1(h). These domestic issues are obviously areas which courts have historically been charged with supervising on behalf of the underlying state interest in protecting the general welfare of its citizens. Furthermore, a legislative directive is arguably created by the requirement imposed by W.Va.Code § 48-2-16(a) for court approval of separation agreements. We can find no reason to except post-decree settlement agreements from this same requirement of court approval, since they fall within the definition of separation agreements. *See* n. 4, *supra.*

While the need for court approval of post-decree property settlement agreements that dispose of issues other than property interests may be easier to understand, the state, nonetheless, has an interest in protecting its citizens from agreements that are fraudulently induced or agreed to as a result of duress or coercion. Similar to *Gangopadhyay* where the wife alleged that her husband intimidated her into agreeing to a settlement just prior to the final hearing, this case includes allegations of fraud and duress. *See* 184 W.Va. at 700, 403 S.E.2d at 717. The factual situation presented by Mrs. Summers at the hearing held on June 7, 1989, before the family law master presents a scenario of her own attorney badgering her into the settlement:

> VIII. Betty Jo Kidd [Mrs. Summers] testified that after the hearing held 12 July 1988, she was very emotional and she had just had an argument with her daughter. After Mr. Straface [her attorney] had his private conference with Mr. Summers, he met the plaintiff [Mrs. Summers] in front of the Taylor County Courthouse and advised her of Mr. Summers' offer of Thirty Thousand Dollars and that if she did not take Thirty Thousand Dollars that she would probably not get a penny and that he was tired of fooling with the case.
>
> IX. [Witnesses] all testified that during the meeting between Mr. Straface and plaintiff ... he was yelling at plaintiff, using profanity, pointing his finger and shaking it very close to plaintiff's face and yelling that if she did not accept Thirty Thousand Dollars she would not get anything.

The implications of these allegations, if true, certainly suggest a need to question further whether Mrs. Summers was indeed a voluntary party to the alleged agreement.

Ultimately, a hearing on the enforceability of the alleged agreement did take place. However, due to the family law master's conclusion that he lacked jurisdiction to address this issue and the circuit court's affirmance of his conclusion, no true and full inquiry was made into Mrs. Summers' allegations of fraud, duress, and coercion. Accordingly, we reverse and remand the

circuit court's order of February 8, 1990, based on our ruling that a post-decree settlement agreement, whether written or oral, must be presented to the circuit court just as a pre-decree agreement must be submitted for approval pursuant to W.Va. Code § 48-2-16(a) to permit the court to make the necessary inquiries to determine that the agreement is fair and reasonable and that it was not procured through fraud, duress or other unconscionable conduct. Other jurisdictions have concluded similarly. *See Masse v. Masse,* 112 R.I. 599, 313 A.2d 642 (1974) (post-decree settlement agreement regarding modification of alimony and support provisions would have been enforceable *if* presented to the family court for approval *and if* the terms appeared fair and reasonable).

We do not mean to suggest that we buy, lock, stock and barrel, Mrs. Summers' arguments regarding the alleged involuntariness of her actions with respect to the agreement at issue. There are certain factors present which weigh against her position. One of these factors is Mrs. Summers' fulfillment of certain aspects of the agreement. For example, she signed a deed on August 22, 1988, and in exchange for transferring her interest in six parcels of real estate covered by such deed, she received the thirty thousand dollars as provided for by the terms of the alleged agreement. The court on remand must consider this fact as well as the length of time which passed prior to Mrs. Summers' objection to the agreement. We note additionally that Mrs. Summers never initiated any proceedings to raise objections to the agreement. Only when Mr. Summers filed his petition seeking enforcement of the agreement on March 6, 1989, did Mrs. Summers, in her reply to said petition which was filed on March 28, 1989, raise the issues of duress and fraud. This failure on Mrs. Summers' part to complain about the agreement until more than eight months after the fact is clearly another factor which the court must weigh in determining whether the parties did have a "meeting of the minds" with respect to the terms of the settlement agreement at issue.

With regard to Mr. Summers' argument that the doctrine of accord and satisfaction prevents Mrs. Summers from raising the issue of the alleged agreement's enforceability, we note the inapplicability of that doctrine. By definition, an accord and satisfaction requires full performance of the terms of the compromise. Once the parties have fully complied with the terms of the compromise agreement, the doctrine is invoked and acts as a bar to all actions upon the same agreement. *See* 1A Michies, *Accord & Satisfaction* at § 1; *Masse,* 313 A.2d at 645. By Mr. Summers' own admission, as demonstrated by the allegations of his petition seeking enforcement of the settlement agreement, Mrs. Summers did not perform all of her part of the agreement. Accordingly, the satisfaction never occurred even if an accord was reached.

The final issue which we address is the circuit court's adoption of the family law master's conclusion that he lacked jurisdiction to rule on prior decrees ordering the sale of the parties' marital property. The family law master based his conclusion on the following syllabus points from *Segal v. Beard:*

1. A family law master lacks jurisdiction to hear a petition for modification of an order when the modification proceeding does not involve child custody, child visitation, child support or spousal support. *W.Va.Code,* 48A-4-1(i)(4) [1986].
2. A circuit court lacks jurisdiction under *W.Va.Code,* 48-2-15(e) [1986] to modify a divorce decree when the modification proceeding does not involve alimony, child support or child custody.

181 W.Va. 92, 380 S.E.2d 444 at Syl. Pts. 1 & 2.

The family law master erred when he concluded that this Court's holding in *Segal* negated jurisdiction to address Mr. Summers' petition. Importantly, Mr. Summers was not seeking a modification of the previously-entered divorce decree as to issues of property distribution as was the case in *Segal. See* 181 W.Va. at 94, 380 S.E.2d at 446. In this case, Mr. Summers filed his petition, not seeking a modification, but

instead seeking enforcement of a post-decree settlement agreement. As we concluded above, family law masters and circuit courts clearly have an obligation to examine such agreements to ensure that they are fair, reasonable, and entered into on a voluntary basis by the parties. Accordingly, the family law master and the circuit court wrongly refused to rule on the enforceability of the alleged settlement agreement on the grounds of nonexistent jurisdiction. We note this error to clarify the misapplication of our previous rulings in *Segal.* A correct statement of the law is that while circuit courts and family law masters lack jurisdiction to modify a divorce decree on property issues as fully discussed in *Segal,* they both have jurisdiction to consider for approval and enforceability a post-decree settlement agreement that includes among its terms, issues of property distribution.

Based on the foregoing opinion, the decision of the Circuit Court of Taylor County is reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded.